**YOUNG & VANN SUPPLY CO. v. UNITED STATES.**

**No. 4448.**

District Court, N. D. Alabama, S. D.

May 1, 1935.

Lee C. Bradley (of Bradley, Baldwin, All & White), of Birmingham, Ala., for plaintiff.

Jim C. Smith, **U. S.** Atty., and W. R. Bradford, Asst. **U. S.** Atty., both of Birmingham, Ala., and W. Croft Jennings, Sp. Asst. to Atty. Gen.

GRUBB, District Judge.

During its fiscal year ending November 30, 1927, the plaintiff sold a parcel of real estate which it had bought in 1919, to National Birmingham Garages, Inc., partly for cash and partly for 1,100 shares of preferred stock of the par value of $100 each, and 1,100 shares of so-called no par value stock (equivalent in fact to common stock) of said National Birmingham Garages, Inc. The last-named corporation was organized in March, 1927, primarily for the purpose of building a special type of storage garage for automobiles in the city of Birmingham, Ala., on the property so acquired from the plaintiff. The delivery by the plaintiff of the deed took place on October 4, 1927. On that date the garage had not been built. Part of the cash paid on that date to the plaintiff represented part of the proceeds of an issue of bonds secured by a trust indenture delivered on that date, and the balance thereof came from the proceeds of sale by National Birmingham Garages, Inc., of other shares of its stock than those deliverable to the plaintiff. Since the cash received by the plaintiff was in excess of the cost to it of the property sold, the plaintiff admits it realized a profit, and the only question for decision is the amount of such profit. Decision of the question in this case depends solely upon the fair market value of the stock of National Birmingham Garages, Inc., received by the plaintiff. See section 202 (c) of the Revenue Act of 1926, 26 US CA § 933 (c).

The plaintiff, on its tax return, had valued the stock delivered to it at $40 per unit of one share of preferred stock and one share of no par value stock, and the Commissioner of Internal Revenue had determined such value to be $100 per unit, and assessed additional taxes against the plaintiff on that basis.

Under the controlling statute, it appears necessary first to determine whether the stock received by the plaintiff on this transaction had a fair market value. If it is determined that the stock did have a fair market value, it then becomes necessary to determine what that value was on the date of receipt of the stock by the plaintiff. From the stipulation of facts and the evidence in the cause, it appears that prior to October 4, 1927, the date here important, National Birmingham Garages, Inc., had sold or contracted to sell for cash to original subscribers an aggregate of 1,598 units of preferred and no par value stock for $100 per unit, in addition to the stock deliverable to the plaintiff as a part of the purchase price of the real estate here in-

volved. While each holder of preferred stock was to receive one share of no par value stock, it appears from the evidence that half of the no par value stock was deliverable to promoters for services in promoting the enterprise and managing it after it should have been completed. The plaintiff introduced evidence to show that with respect to 850 of such units sold or agreed to be sold by October 4, 1927, the purchasers were induced in substantial part to make their respective subscriptions by collateral consideration other than value of the stock of National Birmingham Garages, Inc. (hereinafter for convenience referred to as "Garage Company"), and as to the balance thereof, to wit, 746 units, which was subscribed for by the public generally, the Garage Company was required to and did employ a fiscal agent who was paid the sum of $10 per unit in order to find purchasers therefor who, from the evidence, it can be assumed, had no collateral interest in making subscriptions to said stock. It did not appear that there had been any resales of stock of the Garage Company by October 4, 1927, and that as to the resales thereof made within a reasonable period after that date aggregating a total of at least 80 units, the same fiscal agent was employed to make the resales and upon the payment of the same commission. The plaintiff also introduced evidence to show that it made efforts about the date of receipt of such stock by it to resell such stock or a portion of it through brokerage houses dealing in local securities in the city of Birmingham, and that it was unable to obtain any resales from such efforts. The plaintiff also introduced the testimony of brokers with offices in the city of Birmingham dealing at and since that time in local securities to the effect that there was not, in October, 1927, any market for the resale by the stockholders of the stock in the Garage Company. These brokers also testified as a matter of opinion that the fact that the Garage Company was able to obtain public subscriptions to its stock on original issue, particularly under the conditions involved in this case, did not tend to establish that there was any market for the stock involved. These opinions were based in part upon tendencies of the evidence hereinbefore mentioned to show that many of the subscriptions might have been induced by collateral considerations independent of the value of the stock, including anticipated enhancement in the value of nearby property owned by the respective subscribers, and that an extensive campaign attended by heavy expenses was required in order to obtain subscriptions from the general public. Nevertheless, all of the sales, whether made to those who might have been influenced by collateral considerations or to the general public, were at a price equivalent to the par value of the preferred stock, except in the case of stock deliverable to the plaintiff, as to which no evidence whatever was introduced. Some evidence was introduced in behalf of the plaintiff that an enterprise of this character would not be expected to realize earnings adequate to carry the heavy bonded indebtedness of the Garage Company, and that it would be difficult, if not impossible, to establish a resales market price for the stock, because the enterprise at the date here important had no established earning power, but estimates based upon experience in other cities only could be furnished.

 After consideration of the evidence in the case, I have arrived at the conclusion that it is not proper to disregard the fact of the substantial subscriptions for cash to the stock of the Garage Company in determining whether or not its stock had a fair market value. Even in the case of those who may be assumed to have been induced to make their subscriptions by collateral considerations other than the intrinsic or investment value of the security, I think some weight must be given to the large number of subscriptions obtained, because prospective purchasers of any kind of property are actuated by various motives. But as the evidence disclosed that there was a substantial number of subscribers who could not be said to have been actuated by any collateral considerations, I have arrived at the conclusion that on October 4, 1927, the stock of the Garage Company, even in the absence of resales, had a fair market value within the contemplation of the statute. On the other hand, it appears that under the evidence the sales were made in small blocks and only after an extensive and expensive campaign to find prospective purchasers and to induce them to make subscriptions for the stock of the Garage Company. It appeared from the evidence that such a campaign would have been necessary on the part of the plaintiff, and it is my opinion these factors should be given due consideration in determining what in fact was the fair market value of this stock. This view is supported by the fact that such resales as might be properly given consideration did involve the use of the services of

the fiscal agent employed by the Garage Company. It appears proper to me also to give consideration in respect to the intrinsic value of the security to the heavy expense incurred in issuing bonds and in the sale of the stock of the Garage Company and in the case of market value to the speculative and unseasoned character of the enterprise. After taking all of these factors into consideration, I have arrived at the conclusion that it will be proper to fix the fair market value of the stock received by the plaintiff at $90 per unit.